NOT DESIGNATED FOR PUBLICATION

# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 17-838

**STATE OF LOUISIANA**

**IN THE INTEREST OF**

**P. M. AND T. M.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 3013
HONORABLE STEPHEN BRUCE BEASLEY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## D. KENT SAVOIE
### JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Marc T. Amy, and D. Kent Savoie, Judges.

**AFFIRMED.**

**Richard "T-Dale" Woolbert**
**Attorney at Law**
**750 Southfield Road, Suite C**
**Shreveport, LA 71106**
**(318) 918-5767**
**COUNSEL FOR APPELLANT:**
    **N.P.M.**

**Kimberly S. Smith**
**Department of Children & Family Services**
**1525 Fairfield Avenue-8th Floor**
**Shreveport, LA 71101**
**(318) 676-7347**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana, Department of Children& Family Services**

**Jacqueline Williams**
**Legal Aid of North Louisiana**
**134 St. Denis Street**
**Natchitoches, LA 71457**
**(318) 352-7220**
**COUNSEL FOR OTHER APPELLEES:**
    **P. M.**
    **T. M.**

**D. Scott Kendrick**
**1762 Texas St.**
**Natchitoches, LA 71457**
**(318) 354-9146**
**COUNSEL FOR OTHER APPELLEE:**
    **E. C.**

**SAVOIE, Judge.**

The father, N.P.M.,[1] appeals the termination of his parental rights as to his minor children, P.M. and T.M. For the following reasons, we affirm the trial court's ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 24, 2015, the State of Louisiana, Department of Children and Family Services ("the State"), received a report that the minor children, P.M. and T.M., were being neglected by their biological parents, N.P.M. and E.C., as a result of their parents' dependency on methamphetamines, and that the children's paternal grandparents, N.C.M. and M.M., had been taking care of them since September. P.M. was nine years old at the time, and T.M. was four years old. According to M.M.'s testimony, N.P.M. and E.C. also had a history of violence towards one another, and N.P.M. would often threaten the children, E.C., and/or E.C's other child, M., who ultimately moved in with N.C.M. and M.M. because she was afraid of N.P.M.

The record in this matter suggests that on May 26, 2015, the grandparents went to the trial court to file custody paperwork and that, at the same time, N.P.M. and E.C. had gone to the sheriff's office to file kidnapping charges against the grandparents. Ultimately, N.P.M. and E.C. were brought to the courthouse, and the parties met with a judge at the trial court. During the meeting, N.P.M. and E.C admitted that they would test positive for methamphetamines if they submitted to a drug screen.

Thereafter, on May 26, 2015, the State sought and obtained an oral instanter order from the trial court, which was confirmed in writing on May 27, 2015,

_____

[1] Initials of the parties are used in this matter pursuant to Uniform Rules, Courts of Appeal – Rules 5-1 and 5-2.

finding that continuation in the family home was contrary to the children's best interests and placing the children in the custody of the State. A continued custody hearing order was also signed on May 27, 2015. The children were then adjudicated in need of care pursuant to an order dated August 4, 2015.

The children were initially placed with N.P.M.'s cousin, L.B, who lived in close proximity to the children's grandparents, N.C.M. and M.M., and then they were subsequently placed with N.C.M. and M.M.

On June 15, 2015, the State finalized a written case plan for both N.P.M. and E.C., which they both signed.[2] According to the plan, N.P.M. was scheduled to visit with the children every Friday at the State's office in Many, Louisiana until school began, and then the first and third Fridays of each month. The plan further required N.P.M. to maintain contact with the State; obtain and maintain suitable housing; provide proof of income; provide financial support while the children were in foster care; complete a substance abuse assessment and any recommended treatment; submit to random drug screens; submit to a psychological evaluation and notify the State of appointments; complete domestic violence, anger management, and parenting classes at "Project Celebration;" resolve any criminal issues; and refrain from any criminal activity.

The grandparents sought to intervene in the proceedings on September 1, 2015, alleging that P.M. had lived with them since May 2012, that T.M. had lived with them since May 2014, and that the children's parents had limited contact with the children and provided limited financial support. Following a hearing on the grandparents' motion on September 21, 2015, the trial court signed an order on October 20, 2015, requiring the grandparents, the parents, and the children to

_____

[2] Because this appeal involves only N.P.M., we do not discuss E.C.'s case plan.

submit to a psychological evaluation by Dr. Simoneaux, and to promptly contact Dr. Simoneaux's office and schedule an appointment.

On November 9, 2015, N.P.M. was arrested for distribution of methamphetamines, and he was incarcerated at Bossier Medium Security Facility in Plain Dealing, Louisiana. Ultimately, he was sentenced to five years and five months in prison. According to N.P.M., his full-time release date is in July 2019, but he expects to be released in January 2019, and then spend six months in a half-way house. N.P.M. remained at Bossier Medium until September 2016, and then he was transferred to a federal prison facility in Beaumont, Texas.

A case review hearing was held November 16, 2015. N.P.M. was transferred from the Bossier facility to the trial court for the hearing, and E.C. was also present. Following the hearing, the trial judge rendered a judgment approving the June 2015 case plan and maintaining the children's custody with the State. In connection with the hearing, the State's November 3, 2015 written case review was admitted into evidence. It noted that as of that date N.P.M. had not attended or completed any classes at Project Celebration, and that he had admitted himself to Physicians Behavioral Hospital on September 22, 2015, but signed himself out on September 26, 2015, and was discharged against medical advice. The case review also noted that N.P.M. and had not been to a family visit in the past few months, and that the case worker was not aware of whether the court-ordered psychological evaluation had been scheduled or completed.

On May 16, 2016, a permanency hearing was held. At that time, the State's written case report dated May 2, 2016, was submitted into evidence. According to this report, the children had been placed with their paternal grandparents, N.C.M. and M.M. In addition, the report noted that N.P.M. had not completed any classes

at Projection Celebration; was non-compliant with the substance abuse treatment part of his case plan; had failed to submit to a scheduled drug screen on November 4, 2015; and had not submitted to a psychological evaluation. The State further recommended that the case plan goal be changed to adoption, noting noncompliance by both parents.

A judgment was signed May 16, 2016, maintaining the children in the State's custody and approving a case plan dated May 13, 2016. This case plan was substantially similar to the June 2015 case plan, but specifically required N.P.M. to pay child support in the amount of $10 per month if he was unemployed and $25 per month if he was employed. The plan further directed that all support payments were to be mailed to the State's office in Baton Rouge and that proof of payment was to be provided to the caseworker. A similar judgment was signed November 7, 2016, after a case review hearing, maintaining the State's custody of the children.

The State filed a petition seeking the termination of both E.C.'s and N.P.M.'s parental rights as to P.M. and T.M. on November 15, 2016. E.C.'s rights were terminated on March 13, 2017. E.C. has not appealed.

A hearing as to N.P.M.'s parental rights was held May 22, 2017. At that time, N.P.M. was incarcerated at the federal prison facility in Beaumont, Texas, and he participated in the hearing via telephone. The trial court also heard testimony from N.P.M's caseworker, Ms. Blayke Beasley, as well as the children's paternal grandmother, M.M. Ultimately, the trial judge terminated N.P.M.'s parental rights pursuant to a judgment dated June 14, 2017, and certified the children as eligible for adoption.

4

N.P.M. appeals. In his sole assignment of error, he states: "The trial court erred when it terminated the parental rights of an incarcerated individual because it was impossible for them to complete the requirements of their case plan."

## ANALYSIS

Louisiana Children's Code Article 1015(6) provides the following as a ground for the termination of parental rights:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

In *State ex rel. D.H.L.*, 08-39, pp. 4-5 (La.App. 3 Cir. 4/30/08), 981 So.2d 906, 910 (footnotes omitted), we discussed the State's burden of proof and our standard of review in connection with termination of parental rights proceedings:

> Our supreme court has recognized that the gravity of terminating parental rights requires our courts to impose a stricter standard of proof than the preponderance of the evidence standard; rather, the State must prove by clear and convincing evidence at least one of the statutory grounds contained in La.Ch.Code art. 1015 in order to terminate a parent's rights. *See State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So.2d 1247; La.Ch.Code art. 1035(A). "Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests." *State ex. rel. J.M.*, 837 So.2d at 1253; *see also* La.Ch.Code art. 1037(B).

> An appellate court cannot set aside a juvenile court's findings of fact regarding the termination of parental rights unless it is manifestly erroneous or unless those findings are clearly wrong. *In re A.J.F.*, 00-948 (La.6/30/00), 764 So.2d 47; *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

5

Louisiana Children's Code Article 1036(C) provides that the factors indicating a parent's failure to comply with a case plan may include one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

The State is only required to establish one of these statutory grounds. *State ex. rel. ML*, 95-45 (La. 9/5/95), 660 So.2d. 830.

A lack of reasonable expectation or significant improvement in the parent's conduct in the near future contemplated by La.Ch.Code art. 1015(6) may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate

6

permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

The record supports a finding that N.P.M. has made no substantial progress in completing his case plan since it was first implemented in June 2015.

*Visitation and Contact With the Children*

At the termination hearing, N.P.M.'s caseworker, Ms. Blayke Beasley, testified on behalf of the State. She indicated that from May 26, 2015, when the children were placed into the State's custody, through November 2015, when N.P.M. was incarcerated, N.P.M. had only visited two or three times with the children, which was less than half of the scheduled visitations. N.P.M. testified that while incarcerated at Bossier Medium, he could not call his children because his mother had not put any money into his phone account; however, since October 2016, after he was moved to a federal prison facility in Beaumont, Texas, he has called and spoken with the children every Saturday through the date of the hearing. There is no indication in the record that N.P.M. has seen the children other than the two or three times after they were initially removed in May 2015.

*Financial Support*

The June 2015 case plan contemplated that N.P.M. financially support the children, and the May 2016 case plan specifically required him to pay $10 per month if he was not employed and $25 per month if he was employed. The case plan required that all payments be mailed to the State's office in Baton Rouge. Ms. Beasley testified that N.P.M. had failed to make any financial contributions for the support of the children. N.P.M testified that when the children were first placed into the State's custody in May 2016, he gave his cousin L.B., with whom the children were placed, $500 for the children's support. However, Ms. Beasley

7

indicated she was not aware of any such payment, and N.P.M. did not submit any other evidence at the hearing in order to substantiate this payment.

N.P.M. also stated that he gave an additional $200 for the support of his children. At the hearing, M.M. testified that N.P.M. had received a $1,500 refund check and that the check was sent to her. According to M.M., N.P.M. directed her to spend $200 of that money on the children, and she purchased a television for them with that amount. M.M. indicated that she had informed Ms. Beasley about the money and that Ms. Beasley directed her to send any amount that was to be used for the children's support to the State at the address provided on the case plan; however, M.M. did not do so.

At the termination hearing, N.P.M. testified that he was working at UNICOR making $50 a month while he was incarcerated at that Beaumont facility. There is no indication in the record that any other payments, other than the unsubstantiated $500 payment and the $200 payment alleged by N.P.M., were paid for support of the children.

Even if we were to consider the $200 spent by M.M. as a support payment by N.P.M., given N.P.M.'s employment with UNICOR during his incarceration, he has not satisfied his financial support obligation set forth in the case plan.

*Treatment and Rehabilitation Services*

N.P.M. testified that prior to the children's removal in May 2015, he had been on probation from 2005-2010, had been "clean" for eight years, and then "relapsed" in 2013. He further indicated that prior to his incarceration in November 2015, he had been attending an outpatient substance abuse program at Active Recovery in Shreveport, Louisiana and that he only had three weeks left of

the program prior to his incarceration for distribution of methamphetamines in November 2015.

On September 22, 2016, N.P.M. admitted himself into an inpatient program at Physicians Behavioral Hospital, but he checked out less than a week later on September 26, 2015. According to the State's records, while N.P.M. was at Physicians Behavioral Hospital, he was "diagnosed with Bipolar Addictive Disorder, Type I and amphetamine dependency and hypertension. He signed himself out on September 26, 2015[,] and was discharged AMA (against medical advice). He was noncompliant with the plan that Dr. Guillaume recommended." N.P.M. testified at trial that he had signed himself out because he needed to pay his bills. He was incarcerated however, a few weeks later.

N.P.M. testified that while he resided at the Bossier Medium facility, he was not permitted to participate in a drug rehabilitation program. At trial, a letter dated May 4, 2017, from a drug treatment specialist for the U.S. Department Justice, Federal Bureau of Prisons, was admitted into evidence. The letter reflected that, during N.P.M.'s incarceration at the Beaumont facility, he had participated in a 500-hour residential drug abuse program since February 28, 2017, and he was scheduled to complete the program on December 19, 2017.

Prior to his incarceration, N.P.M. did not attend or complete any domestic violence, anger management, or parenting classes at "Project Celebration" or elsewhere, as contemplated by his case plan. The May 2017 letter from the U.S. Department of Justice indicates that on January 6, 2017, N.P.M. enrolled in a twenty-week parenting course while incarcerated in the Beaumont facility and was scheduled to complete the program on June 6, 2017.

N.P.M. also did not submit to a psychological evaluation by Dr. Simoneaux, as contemplated. He testified that his wife, E.C., had called to schedule their appointments with Dr. Simoneaux after the September 2015 hearing, but that it would be at least three months before an appointment could be scheduled. There is no indication in the record as to whether an appointment was actually scheduled prior to N.P.M.'s incarceration.

On appeal, N.P.M. argues that the trial court's ruling terminating his parental rights was manifestly erroneous because his incarceration prevented him from completing the recommended substance abuse treatment; completing the parenting, nurturing, and anger management classes; visiting with the children; and scheduling or submitting to a psychological evaluation. He testified that he intends to complete the elements of his case plan, and asked the trial court to give him a chance to do so after he is released from prison, prior to terminating his parental rights.

In *State ex rel. A.R.*, 15-497, p. 8 (La.App. 3 Cir. 11/4/15), 178 So.3d 280, 286 (alteration original), this court addressed, and rejected, a parent's defense that incarceration limited the amount of time available to satisfy a case plan, stating:

> Imprisonment is not an excuse to escape parental obligations. *State ex rel. C.M.O.*, 04-1780 (La.App. 4 Cir. 4/13/05), 901 So.2d 1168. Incarceration is not a defense to failure to support or maintain contact with one's children in a termination of parental rights case, particularly because incarceration results from one's actions. *State ex rel. M.H. v. K.W.H.*, 40,332 (La.App. 2 Cir. 9/23/05), 912 So.2d 88. 1168.

> *State in the Interest of O.L.R.*, 13-616, p. 5 (La.App. 3 Cir. 11/6/13), 125 So.3d 569, 573. This court [has] opined that incarceration of a parent is the result of his/her own "conduct and actions" and may not be used "as an excuse for . . . failing to substantially comply with [a] case plan." *Id.*

In the instant case, N.P.M. made little effort to comply with the rehabilitative steps required by his case plan, and even chose to engage in criminal activity resulting in incarceration, which was expressly prohibited by the case plan. While he had begun parenting classes and a drug treatment program at the Beaumont facility a few months prior to the termination hearing, there was no definitive evidence presented indicating that N.P.M. would be able to maintain sobriety outside of a controlled facility, which is what led to his children initially being taken into custody.

We also consider the best interest of the children.

> In termination proceedings, the court must carefully balance the interests of the children and the interests of the parents. While a parent has a natural fundamental interest in the continuing companionship, care, and custody of their children, the child has a profound interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term and continuous relationships found in a home with proper parental care. In balancing these interests, courts have consistently found that the interest of the child is paramount over that of the parent.

*State ex. rel. D.D.M.,* 07-1017, pp. 7-8 (La.App. 5 Cir. 3/25/08), 983 So.2d 141, 145 (citations omitted).

The record indicates that the grandparents have significantly provided for the care of the children. The children have primarily resided with their grandparents since they were placed into the State's custody, and even prior to that time. There was evidence presented that the children have an especially close relationship with M.M., that they are succeeding in school, and that they are otherwise thriving. There was also evidence presented that M.M. is willing to adopt the children. We further note from the record that the children have not seen N.P.M. since prior to his incarceration. Therefore, the record supports a finding that the termination of parental rights is in the children's best interest.

Based on our review of the record, we find that the trial court was not manifestly erroneous in terminating N.P.M.'s parental rights as to P.M. and T.M.

## DECREE

For the reasons set forth above, the judgment of the trial court terminating N.P.M.'s parental rights as to P.M. and T.M. is affirmed. Costs of this appeal are assessed to N.P.M.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules-Courts of Appeal, Rule 2–16.3.